**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**PASQUALE J. GUERRIERO**

       *Plaintiff,*

**v.**                                                    **Civil Action No.: 2:15cv385**

**S.A. MAYO**

       *Defendant.*

## BRIEF IN SUPPORT OF DEFENDANT S.A. MAYO'S MOTION FOR SUMMARY JUDGMENT

Defendant S.A. Mayo (hereinafter, "Detective Mayo"), by counsel, and, pursuant to Federal Rule of Civil Procedure 56 and the Local Rules of Court, submits the following as and for her brief in support of her Motion for Summary Judgment.

## INTRODUCTION

This case arises from a questionable 42 U.S.C. § 1983 claim that discovery proved to be completely meritless. While an employee of the City of Chesapeake Police Department, Plaintiff was charged with several misdemeanor violations of § 18.2-152.5 of the Code of Virginia governing computer invasion of privacy, for which he was ultimately acquitted at a bench trial in Chesapeake Circuit Court. After his acquittal, Plaintiff successfully had his criminal record expunged. Subsequently, he filed this lawsuit against Detective Susan A. Mayo, pursuant to 42 U.S.C. § 1983, alleging she violated his Fourth Amendment rights by arresting him without probable cause. Detective Mayo is entitled to summary judgment because she never physically detained Plaintiff but rather summoned him to court. Furthermore, Detective Mayo is entitled to summary judgment because she is qualifiedly immune from suit for her actions in procuring and executing by summons a warrant of arrest against Plaintiff. Plaintiff has not produced any

evidence that probable cause did not exist to charge Plaintiff with misdemeanor computer invasion of privacy. In fact, the undisputed evidence shows probable cause did exist to charge Plaintiff accordingly.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 56(B), Detective Mayo lists the following facts as to which she contends there is no genuine issue:

1. The Court has subject matter jurisdiction over this matter and personal jurisdiction over the parties.

2. Venue is proper in this Court.

3. Detective Mayo is a Police Officer Specialist who at the time of the allegations in Plaintiff's Complaint worked for the Financial Crimes Division of the Chesapeake Police Department. She had worked in that division since January 1999. (Affidavit of Detective Mayo (hereinafter, "Mayo Aff."), ¶ 2, attached hereto as **Exhibit 1**).

4. Plaintiff was hired as a Police Information Associate (hereinafter, "PIA") for the Chesapeake Police Department on May 6, 2013. (City of Chesapeake, Request for Personnel Action form dated May 3, 2013, attached hereto as **Exhibit 2**).

5. As a PIA, Plaintiff was responsible for, among other duties, taking telephone and in-person complaints and preparing police offense reports. PIAs only prepare reports involving larceny, simple assault, fraud, lost property, and phone threats. They are further permitted to supplement existing reports if new information is provided. Reports involving offenses outside of those categories, such as violent crimes or sex offenses, must be referred to police officers for preparation. (Selected pages from Police Information Associate Policy and Procedures manual, including PIA General Description

of Class, list of Reports Completed by the Civilian Police Information Associate, and list of Reports Not to be Completed by the Civilian Desk Associate, attached hereto as **Exhibit 3**; Affidavit of Lieutenant Michael L. Cole (hereinafter, "Cole Aff."), ¶ 3, attached hereto as **Exhibit 4**; Affidavit of Christine Hill (hereinafter, "Hill Aff."), ¶¶ 3-5, attached hereto as **Exhibit 5**; Affidavit of Carol Jones (hereinafter, "Jones Aff."), ¶ 3, attached hereto as **Exhibit 6**; Affidavit of Debra Morgan-Thomas (hereinafter, "Morgan Aff."), ¶ 3, attached hereto as **Exhibit 7**; Mayo Aff., ¶ 5).

6.    Police reports prepared by PIAs and police officers contain personal identifying information such as social security numbers, birth dates, and driver's license numbers and are treated as confidential material.  (Hill Aff., ¶ 4; Jones Aff., ¶ 3; Morgan Aff., ¶ 4; Mayo Aff., ¶ 5).

7.    Plaintiff received separate formal training from Office Assistant II Carol Jones, Police Information Associate Debra Morgan-Thomas, and Incident Based Reporting Coordinator Christine Hill on how to perform his job duties.  During these training sessions, they repeatedly instructed Plaintiff that he was allowed to go into reports he had authored and to add supplemental information to other like-in-kind reports if necessary, but that he was not permitted to access reports unrelated to the categories of the reports he was assigned to author and that the reports were confidential. (Hill Aff., ¶¶ 3-5; Jones Aff., ¶¶ 3-4; Morgan Aff., ¶ 5).

8.    Because Plaintiff was having difficulty adequately performing his duties despite his training, in August 2013 Plaintiff's Executive Officer, Lieutenant Michael L. Cole, assigned Field Training Officer Shamber Garrett to provide remedial training to Plaintiff.

Lt. Cole ordered FTO Garrett to report back to him on Plaintiff's development and training. (Cole Aff., ¶ 5).

9.  FTO Garrett reported to Lt. Cole that she noticed Plaintiff opening and reviewing various reports not like-in-kind with reports Plaintiff was authorized to open or review, including rape and homicide reports.  FTO Garrett reported to Lt. Cole that she advised Plaintiff on numerous occasions not to view these types of reports. (Cole Aff., ¶ 6).

10. Based on FTO Garrett's report to Lt. Cole, in late August 2013 or early September 2013, Lt. Cole met with Plaintiff to discuss expectations regarding police reports Plaintiff was authorized to access and review.  During that meeting, Lt. Cole explained to Plaintiff he was not authorized to look at any reports he had not authored other than those that are like-in-kind to reports he would create in his official capacity as a PIA and for training purposes only.  At the conclusion of the meeting, Plaintiff acknowledged he understood the expectations described. (Cole Aff., ¶ 7).

11. On September 5, 2013, FTO Garrett reported to Lt. Cole her concern that Plaintiff was continuing to review reports he had not authored and that were not like-in-kind to those he would normally create as a PIA.  FTO Garrett reported to Lt. Cole Plaintiff was continuing to review reports related to violent crimes and sex offenses. (Cole Aff., ¶ 8).

12. Lt. Cole held a meeting with Plaintiff on September 5, 2013 regarding FTO Garrett's observations.  At this meeting Lt. Cole issued a direct order to Plaintiff forbidding him from that day forward from viewing any police reports other than those Plaintiff had authored.  He also directed Plaintiff to contact his supervisor if he had any questions about authoring reports.  (Cole Aff., ¶ 9).

13. Subsequently, Lt. Cole determined Plaintiff had accessed at least eight reports he was not authorized to access after he ordered Plaintiff to stop. Lt. Cole requested an investigation into Plaintiff's actions. (Cole Aff., ¶ 10).

14. Detective Mayo was assigned to investigate the matter. (Affidavit of Kelvin Wright (hereinafter, "Wright Aff."), ¶ 5, attached hereto as **Exhibit 8**; Mayo Aff., ¶ 4).

15. Prior to her assignment on this case, Detective Mayo was investigating Plaintiff in connection with another case in which he was a suspect or person of interest. On November 6, 2013, Detective Mayo contacted Plaintiff via telephone to set up an appointment to discuss that case and instructed him not to review Report 13-65771 because he was a suspect or person of interest in the report. (Mayo Aff., ¶ 3; Transcript of 11/26/13 Interview Between Detective Mayo and Plaintiff (hereinafter, "Transcript"), pp. 3-4, attached to Mayo Aff. as Exhibit 3).

16. On November 20, 2013, while viewing Report 13-65771, Plaintiff accidentally sent a routed request to Detective Mayo to review the report. When Detective Mayo later asked Plaintiff about this request, Plaintiff admitted to unintentionally sending the request to her and that he had no job-related reason for viewing the report: he had viewed the report "out of curiosity" and because he had a "brain fart." The report contained sensitive personal identifying information. (Mayo Aff., ¶ 3; Transcript, pp. 4-5, 8-9; Detective Mayo Investigation Notes, titled "13-76447 Case Notes, Suspect: Pasquale Guerriero" (hereinafter, "Case Notes"), p. 6, attached to Mayo Aff. as Exhibit 1).

17. Section 18.2-152.5 of the Code of Virginia governs the crime of computer invasion of privacy. That statute makes it a Class 1 Misdemeanor when a person "uses a computer or computer network and intentionally examines without authority any employment, salary,

credit or any other financial or identifying information, as defined in clauses (iii) through (xiii) of subsection C of § 18.2-186.3, relating to any other person. 'Examination' under this section requires the offender to review the information relating to any other person after the time at which the offender knows or should know that he is without authority to view the information displayed."

18. Clauses (iii) through (xiii) of subsection C of § 18.2-186.3 are: "(iii) social security number; (iv) driver's license number; (v) bank account numbers; (vi) credit or debit card numbers; (vii) personal identification numbers (PIN); (viii) electronic identification codes; (ix) automated or electronic signatures; (x) biometric data; (xi) fingerprints; (xii) passwords; or (xiii) any other numbers or information that can be used to access a person's financial resources, obtain identification, act as identification, or obtain money, credit, loans, goods, or services."

19. Detective Mayo's investigation revealed that Plaintiff accessed police reports without authorization after being specifically ordered to stop by Lt. Cole. A check of the records system provided over 114 pages of activity showing Plaintiff entering reports of various types. That information was culled down to show reports that Plaintiff had not authored and would have no reason to enter or view. (Mayo Aff., ¶ 4; Case Notes, pp. 5-7).

20. Among others, Plaintiff had accessed and reviewed reports relating to dead bodies, malicious wounding, suicide, rape, and homicide. Plaintiff did not just access the reports, he also went into the attached medical examiner's records, which contain extensive sensitive and personal identifying information. Plaintiff never had any business going into those reports. (Mayo Aff., ¶ 5; Case Notes, p. 5).

21. As a result of her investigation and at the direction of her supervisor and Chief Wright, Detective Mayo pursued a single charge against Plaintiff for violation of § 18.2-152.5. (Mayo Aff., ¶ 8; Wright Aff., ¶ 5).

22. On November 25, 2013, Magistrate Phillip Mann issued a Warrant of Arrest— Misdemeanor for Plaintiff for one count of violating § 18.2-152.5, of the Code of Virginia, governing computer invasion of privacy, after finding "probable cause to believe that [Plaintiff] committed the offense charged, based on the sworn statements of" Detective Mayo. (Mayo Aff., ¶ 8; Warrant for Arrest—Misdemeanor, attached to Mayo Aff. as Exhibit 2; Plaintiff's Objections and Responses to Defendant's First Set of Requests for Admission (hereinafter, "RFAs"), ¶ 2, attached hereto as **Exhibit 9**).

23. On November 26, 2016, Detective Mayo executed the warrant of arrest by summoning Plaintiff to Chesapeake General District Court on December 30, 2013 at 9:00 a.m. Detective Mayo questioned Plaintiff at his place of employment, the Police Department, 2nd Precinct, regarding his unauthorized access of the reports after reading Plaintiff his *Miranda* rights. Plaintiff was not free to leave the premises because the interview occurred during Plaintiff's working hours. However, Plaintiff could have terminated the interview or asked for a lawyer. (Mayo Aff., ¶¶ 9, 11; Transcript of Interview, p. 1-4, 40-41).

24. During this interview, Plaintiff admitted to intentionally accessing reports identified by Detective Mayo. His reasons for accessing the reports between September 5 and November 26, 2013 included: "might have had to go in for something that had to do with what was going on," "to see how it was done," "so I had a guideline," "to have an idea of what was going on," "to see how the reports were being made, even though I don't have

anything to do with it," "I just went in to see how reports are done and to see if there is anything I can learn from them," "to see what was new or ways of how it is done," and "I was looking at cases to see how they are written and ideas of what it was about." He also stated he had a specific reason to access each of the reports, but he did not "know the exact reason at this time. . . It was a job reason. Whatever it was." Later in the interview he stated, "every one of those reports that I went into was related someway to something else. I was looking for somebody's name. I was trying to track down a person's report for something else." He also stated "Sherri" and "Alvarez" had asked him to access some reports, although he could not remember which reports. Detective Mayo found Plaintiff's excuses unconvincing and unsupported by her investigation. (Transcript, pp. 12-16, 20, 22, 32-37; Mayo Aff., ¶¶ 4-6, 9).

25. At no time during Detective Mayo's interview with Plaintiff did Plaintiff state Lt. Cole or First Sgt. Hattie McIntyre had ordered him to view the reports in question, as was alleged in his First Amended Complaint. He did acknowledge, however, that he understood Lt. Cole's order, "loud and clear." (Transcript, pp. 8, 11, 14, 18, 20, 22, 34; Mayo Aff., ¶ 9).

26. At the conclusion of her interview with Plaintiff, and after executing the warrant of arrest by summons, Detective Mayo left to return to her duties. Plaintiff then met with Captain James Dunlap. (Mayo Aff., ¶ 10; Transcript, p. 45).

27. Detective Mayo followed up with Sherri Arnold and Police Officer Edwin Alvarez on whether they had asked Plaintiff to view any of the reports in question. Both informed Detective Mayo they had not. (Mayo Aff., ¶ 9; Case Notes, p. 10).

28.     On May 12, 2014, the Commonwealth's Attorney moved for an entry of *nolle prosequi* for the one count of computer invasion of privacy against Plaintiff because additional information had been discovered. (ECF Doc. No. 6, at ¶ 14; Mayo Aff., ¶ 12; RFAs, ¶ 5).

29.     Around this time, at the request of Detective Mayo, Central Records Supervisor Cena Taylor ran a report showing the police offense reports that Plaintiff had accessed since his date of hire.  Ms. Taylor was able to determine Plaintiff had accessed at least nine reports he would not be authorized to access in the normal course of his duties, including one report in which Plaintiff was a suspect, as well as ones he would not be authorized to access because of the personal identifying information within. (Affidavit of Cena V. Taylor (hereinafter, "Taylor Aff."), ¶¶ 3-4; attached hereto as **Exhibit 10**; Mayo Aff., ¶ 13).

30.     An indictment is a written accusation of crime, prepared by the attorney for the Commonwealth and returned "a true bill" upon the oath or affirmation of a legally impanelled grand jury. A direct indictment occurs when the attorney for the Commonwealth chooses to prosecute the charges initially in circuit court, rather than in district court. (*See* Va. Code § 19.2-216).

31.     On May 19, 2014, the Chesapeake Commonwealth's Attorney approved a request from Deputy Commonwealth's Attorney Derek Wagner to directly indict Plaintiff for eight counts of misdemeanor computer invasion of privacy on the following days in 2013: September 5, 19, 26, October 30, November 5, 7, 12, and 13. (Affidavit of Derek Wagner (hereinafter, "Wagner Aff."), ¶ 3, attached hereto as **Exhibit 11**; RFAs, ¶ 6).

32. On June 3, 2014, a grand jury was impanelled in the Chesapeake Circuit Court and returned a true bill for each of the direct indictments against Plaintiff described in paragraph 31. (Aff. Wagner, ¶ 6; RFAs, ¶ 7).

33. On June 5, 2014, Plaintiff received a Summons to Chesapeake Circuit Court to stand trial for the eight charges of misdemeanor computer invasion of privacy.  Detective Mayo did not serve the Summons on Plaintiff.  She never physically detained Plaintiff, including on June 5, 2014 or on November 26, 2013.  (RFAs, ¶ 8;  Mayo Aff., ¶ 11).

34. Detective Mayo never placed her hands on Plaintiff in connection with any of the allegations of Plaintiff's lawsuit. (Mayo Aff., ¶ 11; RFAs, ¶ 9).

35. Plaintiff never had a bond hearing in connection with the misdemeanor computer invasion of privacy charges against him. (RFAs, ¶ 14).

36. On December 16, 2014, following a bench trial in Chesapeake Circuit Court, Substitute Judge C. E. Poston found Plaintiff not guilty of all counts of misdemeanor computer invasion of privacy. (Wagner Aff., ¶ 7).

37. On November 26, 2013, the Chesapeake Police Department initiated an internal Ethics and Conduct investigation into Plaintiff's alleged unauthorized access of certain police reports, including a police report in which he was a suspect. (Affidavit of Kelvin L. Wright, Chief of Police (hereinafter, "Wright Aff."), ¶ 6).

38. On January 27, 2015, Colonel Kelvin L. Wright, Chief of Police, notified Plaintiff by letter that Plaintiff was charged with violating policies set forth in the department's Policy and Procedure Manual as well as certain City of Chesapeake Administrative Regulations.  (Wright Aff., ¶ 3, Notice of Charges, attached to Wright. Aff. as Exhibit 1).

39. Specifically, Plaintiff was charged with violating the general duty requirement of speaking the truth at all times, the duty to obey lawful orders from a superior officer, and the prohibition against using department-issued equipment for other than work-related activities. (Notice of Charges, pp. 1-2).

40. Before discipline was imposed on Plaintiff, he resigned his employment with the City through an email sent to Chief Wright's assistant on March 27, 2015. Colonel Wright accepted Plaintiff's resignation on March 31, 2015. (Wright Aff., ¶ 8; Email Exchange between Plaintiff and Karen Green, attached to Wright Aff. as Exhibit 2).

41. Prior to filing this lawsuit, Plaintiff had the criminal record and files associated with his charges of misdemeanor computer invasion expunged. The expunged records are sealed and no longer accessible. (Aff. Taylor, ¶ 7; Wright Aff., ¶ 9; Wagner Aff., ¶ 8; Cole Aff., ¶ 13; Mayo Aff., ¶ 16).

42. Detective Mayo served discovery requests on Plaintiff on May 17, 2016. (Defendant S.A. Mayo's First Set of Interrogatories to Plaintiff, First Set of Requests for Production of Documents to Plaintiff, and First Set of Requests for Admission to Plaintiff, attached hereto as **Exhibit 12**).

43. Plaintiff first objected and responded to Detective Mayo's discovery requests on June 23, 2016. (Plaintiff's Objections and Answers to Defendant's First Set of Interrogatories and Objections and Responses to Defendant's First Set of Requests for Production, Objections, attached hereto as **Exhibit 13;** RFAs, p. 6).

44. Plaintiff did not timely file, pursuant to Local Rule 26(C), his objections to Detective Mayo's discovery requests.

45.     Plaintiff has not deposed Detective Mayo or any other potential witnesses nor has Plaintiff identified anyone other than his criminal defense attorney as a person with knowledge of the allegations against Detective Mayo and damages he allegedly sustained.  As of the date of this filing, Plaintiff also has not subpoenaed any witnesses for trial.  (Plaintiff's Supplemental Answers to Defendant's First Set of Interrogatories, ¶ 5, attached hereto as **Exhibit 14**).

## ARGUMENT

Full summary judgment is appropriate at this juncture in the case.  Pursuant to this Court's Rule 16(b) Scheduling order, the parties have completed discovery and the trial on this matter is set for September 12, 2016.  No genuine issues of material fact are disputed that would prevent the Court from ruling on this matter.  Moreover, "claims of qualified immunity are appropriate for resolution on summary judgment because immunity is an 'entitlement not to stand trial or face other burdens of litigation.'"  *David v. Mosley*, 915 F. Supp. 776, 782 (E.D. Va. 1996) (quoting *Turner v. Dammon*, 848 F.2d 440, 443 (4th Cir. 1988)).

## I.      Summary Judgment Standard

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (emphasis added).  No genuine issue exists if the evidence is such that no reasonable jury could return a verdict for the non-moving party.  *See id.* at 248.  The party seeking summary judgment has the initial burden to show the absence of a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be

discharged by showing–that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). To avoid summary dismissal of his claims, therefore, Plaintiff must produce evidence establishing every element on which he will bear the burden of proof at trial. *See id.* at 322-23; *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F. 2d 211, 216 (4th Cir. 1987).

"The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). In this regard, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F. 2d 1126, 1128 (4th Cir. 1987); *Ross v. Communications Satellite Corp.*, 759 F. 2d 355, 364 (4th Cir. 1985). Nor is it sufficient for the plaintiff to "[rest] upon the bald assertions of his pleadings." *Ross*, 759 F.2d at 364. If the party seeking summary judgment meets its burden, "[t]he opposing party must demonstrate a triable issue of fact exists; he may not rest upon mere allegations or denials." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citations omitted).

## II.    Detective Mayo is Entitled to Summary Judgment

In this case, Plaintiff claims Detective Mayo did not have probable cause to arrest him and therefore violated his Fourth Amendment rights under the U.S. Constitution. As is discussed more fully below, Plaintiff relies solely on his own assertions and can produce no other testimony or documentation to support his allegations that probable cause did not exist. Neither

can Plaintiff produce any evidence supporting that Detective Mayo physically detained him, beyond his personal feelings. In contrast, the evidence produced by Detective Mayo not only supports that she had probable cause to pursue charges against him but also that she never physically detained Plaintiff. And because probable cause existed, Detective Mayo is entitled to qualified immunity from Plaintiff's claims. Even if probable cause did not exist, an objectively reasonable officer in Detective Mayo's position would have believed it did, as evidenced by Magistrate Phillip Mann, the Chesapeake Commonwealth's Attorney, and a grand jury finding probable cause under the same set of facts as Detective Mayo. For these reasons, the Court should grant summary judgment in this case on all of Plaintiff's claims and dismiss this action with prejudice.

        *a.*        ***Detective Mayo Never Seized Plaintiff Within the Meaning of the Fourth Amendment***

Detective Mayo never physically detained Plaintiff. The undisputed facts show that on November 26, 2013, she served the Warrant of Arrest—Misdemeanor on Plaintiff and released him on a summons to Chesapeake General District Court. *See*, *supra* Statement of Material Facts Not in Dispute (hereinafter, "Facts"), ¶¶ 23, 26, 33-35. She did not serve the Summons on Plaintiff regarding his charges in Chesapeake Circuit Court. Facts, ¶ 33. "A summons to answer charges on a criminal complaint is not, by itself, a seizure under the Fourth Amendment." *Myers v. Shaver*, 245 F. Supp. 2d, 805, 812 (W.D. Va. 2003) (citing *Britton v. Maloney*, 196 F.3d 24 (1st Cir. 1999)). As explained in *Myers*:

>         Fourth Amendment seizure is a discrete event, "effected with force or the threat of it." *United States v. Dionisio*, 410 U.S. 1, 10, 35 L. Ed. 2d 67, 93 S. Ct. 764 (1973); *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001). A law enforcement officer who neither physically restrains a suspect nor implicitly or explicitly threatens to use force to detain him has not "seized" him within the meaning of the Fourth Amendment. "One is 'seized' within the fourth amendment's meaning only when one is the *intended object* of a physical restraint by an agent of the state," *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir.

1991) (emphasis in original), so as to cause a "termination of [the suspect's] freedom of movement." *Brower v. County of Inyo*, 489 U.S. 593, 596-97, 103 L. Ed. 2d 628, 109 S. Ct. 1378 (1989); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).

      Given this classic formulation of the Fourth Amendment, "seizure" has no application to non-physical restraints. "The view that an obligation to appear in court to face criminal charges constitutes a Fourth Amendment seizure is not the law." *Nieves*, 241 F.3d at 55. Though a summons may impose a burden, a defendant summoned to appear in a criminal case faces no greater restraint than the person summoned for any number of a host of civic responsibilities. *Dionisio*, 410 U.S. at 9-10. A subpoena before a grand jury, a testimonial subpoena, or a call to jury duty each threatens "the possibility of confinement if [one] fails to appear in court," but none constitutes a seizure. *Britton*, 196 F.3d at 29-30; *Dionisio*, 410 U.S. at 10. Likewise, the issuance of the summons was not a seizure.

*Id.*

When Detective Mayo served the warrant of arrest on Plaintiff on November 26, 2013—the only time Detective Mayo was involved with serving a warrant on Plaintiff—she did not handcuff him, place her hands on him, or take him into her custody. ¶¶ 23, 26, 33-35. She did not transport him to jail for booking. Facts, ¶ 35. Rather, at the conclusion of her interview with Plaintiff in which she served the warrant of arrest by summons, she returned to her work duties and Plaintiff then met with Captain Dunlap. Facts, ¶ 26. In no way, therefore, had Detective Mayo physically restrained or detained Plaintiff. Even if she had, as discussed below, there was probable cause to do so. Consequently, Detective Mayo has not violated Plaintiff's constitutional rights under the Fourth Amendment and Plaintiff's claims should be dismissed.

### b. Probable Cause Existed to Charge Plaintiff with Misdemeanor Computer Invasion of Privacy, Thus Cloaking Detective Mayo with Immunity

Detective Mayo is entitled to qualified immunity. "Qualified immunity protects government officials from civil suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *LaSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 269 (4th Cir. 2012) (citations

omitted).  "A right is 'clearly established' if 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.*

The first inquiry the Court must make in assessing the applicability of the doctrine of qualified immunity is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 206, 121 S. Ct. 215, 150 L. Ed. 2d 272 (2001); *Mazuz v. Maryland*, 442 F.3d 217, 224 (4th Cir. 2006).   If the answer is "no," the analysis need go no further and qualified immunity bars the action.  *Saucier*, 533 U.S. at 201; *Mazuz*, 442 F.3d at 225.  The second inquiry is whether the right alleged to have been violated was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional. *Saucier*, 533 U.S. at 201; *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

Regarding the first inquiry, Plaintiff has failed to produce *any* evidence supporting Detective Mayo violated his constitutional rights.   Despite Plaintiff's baseless assertion otherwise, Detective Mayo had probable cause to pursue charges for misdemeanor computer invasion of privacy against Plaintiff.  Probable cause exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *accord Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003).

In this case, the undisputed facts support that Plaintiff intentionally accessed police reports for which he did not have authorization to access, contrary to his training and in violation of a direct order from his executive officer, Lt. Cole.  Facts, ¶¶ 5, 7, 9, 10-13, 16, 19, 20.  The police reports Plaintiff accessed contained personal identifying information.  *See* Facts, ¶¶ 6, 16,

19-20, 24. Plaintiff did not only access the police reports, he opened the attachments and reviewed medical examiner's records, which further contain sensitive and personal identifying information. Facts, ¶ 20. He did not have any business going into those. *Id.* Additionally, Plaintiff admitted to accessing a police report for a case in which he was a suspect, even after Lt. Cole's direct order prohibiting him from accessing reports he did not author *and* after Detective Mayo warned him not to access that specific report. Facts, ¶¶ 15-16. His only explanations for accessing that report was that he had a "brain fart" and that he accessed it "out of curiosity." Facts, ¶ 16. His generalized explanations for accessing the other reports were unconvincing to Detective Mayo and unsupported by her investigation. *See* Facts, ¶¶ 24.

Under these facts and further pertinent to the second inquiry of the qualified immunity doctrine, a prudent person and reasonable officer, like Detective Mayo, would believe that Plaintiff intentionally examined reports containing identifying information of other persons, in violation of § 18.2-152.5. Indeed, given these facts, a neutral magistrate issued the warrant for Plaintiff's arrest after finding probable cause existed for the original charge against Plaintiff. *See* Facts, ¶ 22. The Chesapeake Commonwealth's Attorney concurred and approved direct indictments of Plaintiff. Facts, ¶ 31. A lawfully impanelled grand jury further found probable cause existed to justify returning a true bill for Plaintiff's indictment for eight violations of § 18.2-152.5. Facts, ¶ 32.

"The Supreme Court and the Fourth Circuit have frequently held that the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Graham v. Gagnon*, 104 F. Supp. 3d 753, 758 (E.D. Va. 2015) (citing *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245, 182 L. Ed. 2d 47 (2012) and *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991)). According to *Graham*:

"When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983. Otherwise, the threat of liability would force officers to continuously second-guess the considered decisions of magistrates." *Id.*; *see also United States v. Leon*, 468 U.S. 897, 921, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination.).

*Graham*, 104 F. Supp. 3d at 753; *see also Spinelli v. United States*, 393 U.S. 410, 419, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969) (A magistrate's finding of probable cause receives "great deference.").

Additionally, although Detective Mayo never served the summons issued by the Circuit Court on Plaintiff, Facts ¶ 33, even if she had, she was entitled to rely on the views of Deputy Commonwealth's Attorney Wagner who sought an indictment against Plaintiff, as well as the fact that a grand jury returned a true bill on each of the direct indictments against Plaintiff. *See Davis v. Mosely*, 915 F. Supp. 776, 786 (E.D. Va. 1996) (finding a federal law enforcement officer acted with objective reasonableness when relying on views of Assistant United States Attorney who sought an indictment against the plaintiff and the fact that a federal grand jury had indicted the plaintiff).

Moreover, "[i]n the Supreme Court's words, qualified immunity provides officials with 'breathing room to make reasonable but mistaken judgments.'" *Id.* (citing *Ashcroft v. Al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)). As this Court has explained, "[t]his is particularly important in the law enforcement context where the ability of officers "to protect the public can be severely hampered . . . if their every decision is subject to second-guessing in a lawsuit." *Graham*, 104 F. Supp. 3d at 757 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)). Indeed, when "[a]pplied properly, qualified immunity protects

all but the plainly incompetent or those who knowingly violate the law. *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

The undisputed facts show that Detective Mayo was neither plainly incompetent nor did she knowingly violate the law. Instead, they support that Plaintiff's actions in accessing the reports that contained personal identifying information described in Virginia Code § 18.2-152.5 after his extensive training and receiving an explicit order not to were sufficiently suspicious to justify not only a neutral magistrate but also a Deputy Commonwealth's Attorney and grand jury finding probable cause to prosecute Plaintiff.

Apparently, the gist of his § 1983 claim is that because Plaintiff was later acquitted in a criminal trial of the charges, Detective Mayo lacked the requisite probable cause in arresting him in the first place. The law is well-settled that such an argument is misguided:

> "The validity of the arrest does not depend on whether the suspect actually committed a crime; **the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest**." *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979). Moreover, "[t]he Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted — indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Further, the probable cause standard is lower than the standard to convict. "Probable cause requires only 'a reasonable ground for belief of guilt,'" *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) (quoting *McCarthy v. De Armit*, 99 Pa. 63, 69, 1 Pennyp. 297, 39 Legal Int. 23, 29 Pitts. Leg. J. 141 (1881)), but to convict a defendant, the State must prove the defendant's guilt beyond a reasonable doubt, *see, e.g.*, *United States v. Booker*, 543 U.S. 220, 230, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). To be sure, probable cause requires more than bare suspicion, but it is a flexible standard that need not amount to evidence necessary to convict. *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. Feb. 27, 2012).

*Vaughn v. Whitfield*, 2013 U.S. Dist. LEXIS 131293, *45-46 (D.S.C. July 30, 2013) (emphasis added).

Given the foregoing, Detective Mayo is entitled to qualified immunity from Plaintiff's claims and this Court should grant her motion for summary judgment.

## **CONCLUSION**

For the foregoing reasons, Defendant Susan A. Mayo is entitled to summary judgment and this Court should dismiss Plaintiff's claims with prejudice.

**S. A. MAYO**

By: _____/s/_____
Of Counsel

Melissa A. Hamann, Esquire (VSB #82179)
Ryan C. Samuel, Esquire (VSB#84400)
Office of the City Attorney
City of Chesapeake
306 Cedar Road
Chesapeake, VA 23322
Phone: (757) 382-6586
Fax: (757) 382-8749
rsamuel@cityofchesapeake.net

***Counsel for Defendant S.A. Mayo***

## CERTIFICATE OF SERVICE

I certify that on the 15th day of August, 2016, a true copy of the foregoing Brief in Support of Defendant S. A. Mayo's Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

S.W. Dawson, Esquire
Dawson, P.L.C.
P.O. Box 58
Norfolk, Virginia 23501
swd@dawsonplc.com

***Counsel for Plaintiff***

_____/s/_____
Melissa A. Hamann
Assistant City Attorney